[Civ. No. 27194. Second Dist., Div. Two. Oct. 10, 1963.]

FREEMAN A. NOLL, Plaintiff and Appellant, v. ROBERT E. LEE, Defendant and Respondent.

Smith, Butts & Diekman, Toxey H. Smith, Benjamin Reinhardt and Robert S. Butts for Plaintiff and Appellant.

Wyman, Finell & Rothman and Charles L. Fonarow for Defendant and Respondent.

HERNDON, J.—Plaintiff appeals from the judgment entered upon a "nine to three" jury verdict in defendant's favor. The only assignment of error is that the trial court erred in denying plaintiff's motion for a new trial when it became known, following the receipt of the jury's verdict, that one of the jurors had taken a copy of the Vehicle Code into the jury room and had read to the other members of the jury certain sections of said code which had not been included in the court's instructions.

The action was one for damages for personal injuries arising out of an automobile accident which occurred on the Ventura freeway on April 6, 1960. Defendant was driving a station wagon and was carrying a stepladder, an electrical extension cord and certain other materials and equipment therein. The stepladder, extension cord and several pieces of lumber fell from defendant's station wagon into the path of plaintiff's automobile. Plaintiff stopped his automobile on the center divider and then attempted to remove the fallen articles from the freeway. While so engaged he was struck by another vehicle.

The correctness of the instructions given the jury is not questioned on this appeal. In substance, these instructions set forth the law applicable to the issues of negligence and contributory negligence in cases where the plaintiff had placed himself in a dangerous position in an effort to protect the safety of others from the consequences stemming from the alleged initial negligence of the defendant. Sections of the Vehicle Code relating to "spilled loads" (§ 23114) and pedestrians (§ 21954, subd. (a)) were also requested and given, together with instructions relating to the presumptions arising from violations of such statutes.

After the jury had returned its verdict, the events that form the factual basis of this appeal were disclosed. It is conceded that neither counsel nor the court should be regarded as blameworthy for failing to make an earlier discovery of the facts here presented.

The affidavit of the offending juror, which was filed in support of plaintiff's motion for a new trial, reads as follows:

"My name is Ernst Fischer and I live at 2311 Baxter St., Los Angeles, California. I served on the jury in the case of *Noll* v. *Stoffer*.

"The verdict rendered in the *Noll* v. *Stoffer* case which involved a pedestrian violating the right of way of a car while picking up objects on the freeway is absolutely correct. The vehicle code is very plain on this point. I checked the vehicle code on this point and found several provisions which applied to this case. I read these sections to the jury and most of them agreed with the law I read. There were a few jurors who were sympathetic to the plaintiff because he was injured. These jurors wanted the Judge to re-read the instructions, but this did not change the opinion of the majority of the jurors. When the judge re-instructed the jury he mentioned one of the vehicle code sections I had already read to the jury and which most of the jury agreed with me applied to the case. In my service on juries I have found that most jurors are very vague on the law and do not understand the many instructions read by the judge. This is the reason I carry the vehicle code with me at all times. I had it with me when I was accepted as a juror and while the attorneys were asking me questions before I became a juror. I think that all jurors should have a copy of the vehicle code with them on all cases involving vehicles. The vehicle code sections which controlled this case are Vehicle Code Sections 23331 and 23332. . . .''

Additional affidavits of four other members of the jury are to the effect that juror Fischer had a copy of the Vehicle Code in the jury room during their deliberations; that he read excerpts therefrom to the other jurors after they had been instructed by the trial court, and that Fischer made reference thereto on occasion.

By way of opposition to plaintiff's motion, defendant obtained and filed three counter affidavits sworn to by juror Fischer on October 5, 1962. In material part they read as follows:

(1) "On September 15, 1962, a person came to my home and asked if he could question me regarding some of my experiences as a juror. He told me that he was a representative of a group of attorneys who were desirous of making some changes in the system of jury deliberation in this state. At no time did he tell me that he was a representative of Mr. Freeman Noll or a representative of Mr. Toxey Smith. The

first time that I was certain of the fact that he was a representative of Mr. Noll and Mr. Smith was when I was definitely informed of that fact by Mr. Milton Yusim in a telephone conversation that I had with him on October 4, 1962, when he telephoned my home.

"The affidavit dated September 15, 1962, that bears my signature was completely prepared and typed by some unknown person before it was brought to me and shown to me on September 15, 1962. At no time did I dictate the content of that affidavit before it was typed. That portion of the affidavit which states 'I had it (the Vehicle Code) with me when I was accepted as a juror and while the attorneys were asking me questions before I became a juror,' that portion is untrue. Although I stated in that affidavit that all jurors should have a copy of the Vehicle Code with them on all cases involving vehicles, I did not intend to imply or suggest in any way by that statement that jurors who are selected to hear a case should not follow all of the court's instructions in rendering their decision.

"I regret that I did not read the affidavit of September 15, 1962 over more carefully or I would have discovered the mistakes that are contained therein. I was told by the person who presented the affidavit to me that it was to be used in an attempt to improve the jury system by a group of attorneys who wanted to make some changes to permit typewritten copies of the court's instructions to be brought into the jury room during their deliberation. When I questioned the investigator that presented the affidavit of September 15, 1962 to me as to whether or not the statement was to be used in any way in connection with the case of *Noll* v. *Lee,* he told me that it was not to be so used.

"Although the affidavit states that my statements were sworn to before a notary public, I was never asked to swear to any of the statements contained therein.

"I regret that I did not know or appreciate the seriousness and the use that was going to be made of the affidavit before. If I had so appreciated the seriousness of the situation, I would have read the affidavit more carefully. I was simply informed that the investigator had affidavits of twenty other jurors that had been obtained in the jury assembly room for the purpose of making changes in the method of jury deliberation."

(2) "When I retired to the jury room to deliberate in the case of *Noll* v. *Lee,* I entered that jury room as an unbiased

juror intending to render a decision without regard to passion, prejudice, or bias for or against either party. When the court instructed us on the law to be followed, before we deliberated I listened carefully to the instructions of the court and I fully intended to and would to the best of my ability apply the law as instructed by the court to the facts of this case in my deliberation. I truthfully felt as did eight other jurors, that based upon the evidence presented and the law as instructed by the court, that Mr. Noll was not entitled to a verdict and therefore, I honestly and truthfully rendered my verdict for the defendant and following the instructions as given by the court in connection with this case. Although I had in my possession a summary of the California Vehicle Code at the time the jury was deliberating, it was my opinion as well as the opinion of eight other jurors that the defendant was entitled to a verdict based upon the law that had been read to us by the Judge in the court room. The possession or reading of the summary of the Vehicle Code of the State of California did not alter my position that the defendant was entitled to a verdict based upon the court's instructions. Although I read one portion of the summary of the California Vehicle Code, I can truthfully and honestly state that my verdict and the verdict of the eight other jurors would have been the same even if I had been without the summary of the Vehicle Code in my possession.''

(3) ''I was questioned by both attorneys regarding my qualifications to sit as a juror before being selected as a juror to hear the case. I truthfully and honestly answered all such questions which were asked of me.

''While being questioned regarding my qualifications to sit as a juror, I was asked if I would follow the court's instructions regarding the law to be applied in this case. I answered that I would follow the court's instructions and when I so answered in the affirmative, it was my truthful intention to follow the court's instructions. My true intentions were to follow and apply the law as the court would instruct. At no time did I conceal either intentionally or unintentionally any of my motives or intentions in this case. When I was sworn in as a member of the jury, I was completely impartial and had no bias or prejudice for or against either of the parties. I truly intended to listen to all of the evidence and to render my verdict based upon the evidence that was presented and the law to be instructed by the court.''

It may be noted initially, of course, that the three affidavits

last quoted traverse only one factual statement contained in the first affidavit, i.e., it is alleged that he did not actually have a copy of the vehicle code in his possession while being examined on *voir dire* or at the moment he was accepted as a juror. It is not denied that the reason he carried the vehicle code into the jury room was his belief that "most jurors are very vague on the law and do not understand the many instructions read by the Judge" and that "all jurors should have a copy of the vehicle code with them on all cases involving vehicles." Neither is it denied that he entertained these beliefs, and intended to implement them in the manner indicated, at the time he gave his answers on *voir dire* or when he was accepted as a juror.

The resolution of the issues presented by plaintiff's motion for a new trial required the trial court to consider two determinative questions. First, could the affidavits here presented properly be used to impeach the verdict? Second, assuming that they could properly be so used, do they demonstrate that the trial accorded the plaintiff was not consistent with accepted judicial procedure, and that he was substantially prejudiced? The order denying the motion for a new trial does not indicate how those questions were resolved below. We have concluded that both of the stated questions must be answered in the affirmative and, therefore, that the judgment must be reversed.

 "It is the general rule in California that affidavits of jurors may not be used to impeach a verdict. [Citations and examples.] An exception to the general rule is made by statute where 'any one or more of the jurors have been induced to assent to any general or special verdict . . . by a resort to the determination of chance. . . .' [Citation.] Another exception, recognized by judicial decision, is that affidavits of jurors may be used to set aside a verdict *where the bias or disqualification of a juror was concealed by false answers on voir dire.* [Citation.]" (Italics added.) (*Kollert* v. *Cundiff,* 50 Cal.2d 768, 772-773 [329 P.2d 897]. See also *Sopp* v. *Smith,* 59 Cal.2d 12, 14 [27 Cal.Rptr. 593, 377 P.2d 649].)

 Since all of the several affidavits filed herein are consistent in their declarations of facts which are determinative as a matter of law, we are not confronted with the rule requiring us to presume that all factual conflicts were resolved by the trial court in respondent's favor; such resolutions, of course, are binding upon appeal. (*Luz* v. *Lopes,* 55

Cal.2d 54, 62 [10 Cal.Rptr. 161, 358 P.2d 289].) Rather, we must here determine whether, *as a matter of law*, the offending juror concealed a disqualifying mental attitude by false answers given on *voir dire*.

No appellate court in this state appears to have been called upon to consider a problem similar to that here presented. In the usual case, a juror's bias or disqualification will relate to his beliefs, his personal knowledge of the facts involved in the litigation, his acquaintanceship with the parties or their counsel, any or all of which may cause him to be unsuitable to serve as a juror because consciously or unconsciously he naturally would be inclined to favor one side or the other. In the instant case, however, we have a juror who very definitely was opposed to the entire concept of the jury system in that as the result of his "service on juries" he had come to believe that "most jurors are very vague on the law and do not understand the many instructions read to them by the Judge."

In *Church* v. *Capital Freight Lines*, 141 Cal.App.2d 246 [296 P.2d 563], appellants sought a new trial based upon affidavits tending to prove that they were denied their fundamental right to a jury trial because one of the jurors had been adjudged mentally incompetent. It was there that the general rule relating to the receipt of affidavits only when the juror has given false answers on *voir dire* did not apply and that (p. 248):

"Contrary to defendants' argument, the very nature of the affliction would preclude the application of any rule predicated upon rationalization such as the intentional or unintentional failure to disclose one's disqualification. *Therefore in the present case the court properly considered the affidavits of the jurors, not for the purpose of impeaching the verdict, but to assist it in determining the qualifications of Sindel [the juror in question] to serve as a juror.*" (Italics added.) The order denying the motion for new trial was affirmed, however, because unlike those presented in the instant case, the affidavits there presented contained conflicting evidence with respect to the determinative issue of fact, that is, whether or not the juror actually had been mentally incompetent during the trial.

Of course, it is a fundamental and historic precept of our judicial system that jurors are restricted solely to the determination of *factual* questions and are bound by the law as given them by the court. They are not allowed either to de-

termine what the law *is* or what the law *should be.* The juror in the instant case, however, not only disagreed with this concept, but actively manifested his disagreement by reading to the other members of the jury sections of statutory law which he felt were applicable notwithstanding that the judge had not instructed them thereon. His admitted conduct, which apparently he still regarded as having been proper, was, in fact, in direct conflict with the court's instructions.[1]

Since it appears that Fischer had served on juries several times before, it cannot be doubted that he had previous knowledge of the basic rules which are here applicable. Nevertheless, he conceived that it was his prerogative to instruct his fellow jurors upon the law, and to use in this undertaking a lawbook which he carried into the jury room for that very purpose. In point of fact, neither of the Vehicle Code provisions which the offending juror felt to be controlling was among those included in the trial court's instructions to the jury.

Upon the *voir dire* examination, each of the prospective jurors was asked the usual questions relating to his willingness to follow the instructions given by the court. The offending juror who became one of the panel as the result of the exercise of peremptory challenges, stated that his answers to all questions previously asked of the other jurors would have been the same as theirs. In addition, he was specifically asked, *inter alia,* the following questions:

"Mr. Smith, Jr.: Now, if the evidence in this case discloses that there are substantial and serious damages or injuries in this case, would you hesitate, if the evidence *and instructions* warranted it, to award a substantial verdict for those injuries? Mr. Fischer: No . . . Mr. Smith, Jr.: Very good, sir, and as a trier of fact, you will weigh all the evidence in this case *and apply the weight of the evidence as it is presented to you with the instructions of the Court* to decide these issues? Mr. Fischer: Yes. . . ."

"Mr. Yusim: Mr. Fischer, there have been many questions

---

[1]The first instruction given the jury was as follows: "Ladies and Gentlemen of the Jury: It becomes my duty as judge to instruct you in the law that applies to this case, and *it is your duty as jurors to follow the law as I shall state it to you.* On the other hand, it is your exclusive province to determine the facts in the case, and to consider and weigh the evidence for that purpose. The authority thus vested in you is not an arbitrary power, but must be exercised with sincere judgment, sound discretion, and *in accordance with the rules of law stated to you.*" (Italics added.) (BAJI No. 1.)

posed about how to judge human nature here by other counsel. *Will you listen carefully to the instructions of the court about the law to be followed* and how we should judge our fellow human beings in their actions at various times and places in their life? *Will you listen to the instructions of the Court, sir?* Mr. Fischer: Sure will." (Italics added throughout.)

It is apparent that these answers (given by a man who has determined, as the result of his previous experience in jury service, that he is going to research the law himself and instruct his fellow jurors thereon) not only were designed to conceal his true intentions, but were absolutely false. Naturally, of course, he was not asked the specific question whether he intended to take a copy of the Vehicle Code into the jury room and read therefrom such portions as he deemed controlling. No attorney or trial judge reasonably could be expected to anticipate such a design, and Mr. Fischer, who was the only party aware thereof, failed to disclose it in answering questions sufficiently specific to require such disclosure.

It is equally apparent that, while Fischer may not have been biased for or against either plaintiff or defendant in the usual sense, he was, in truth, "biased" against the entire jury system, and against basic rules which long have governed its operation. As a result, neither party could receive a fair trial based upon, and only upon, the law as stated in the court's instructions. We therefore conclude that the affidavits were properly received and considered in support of plaintiff's motion for a new trial.

In reaching this conclusion we are not unmindful of the reasoning which has lead to the refusal to allow a consideration of such affidavits as a general rule. As stated in *Kollert* v. *Cundiff, supra,* 50 Cal.2d 768, 773-774, and repeated in *Sopp* v. *Smith, supra,* 59 Cal.2d 12, 14:

"The problem involves the balancing of two conflicting policies. It is, of course, necessary to prevent instability of verdicts, fraud, and harassment of jurors, and, on the other hand, it is desirable to give the losing party relief from wrongful conduct by the jury. The court in *McDonald* v. *Pless* (1915) 238 U.S. 264, 267-269 [35 S.Ct. 783, 59 L.Ed. 1300, 1302-1303], after discussing these policies and stating that the wrong to the individual was the lesser of two evils, concluded that as a general rule the affidavits should be excluded *but that there might be instances where the rule could not be applied without 'violating the plainest principles of*

*justice.'* " (Italics added.) We feel that this is a case which falls within the instances contemplated by the last quoted clause.

The facts revealed by the instant record involve far more than an investigation into the "latent prejudices" of a juror, or misconduct of which he may have been guilty during deliberations but of which he had no thought during the questioning leading to his selection. The inappropriateness of such latter types of investigation is well stated in the concurring opinion of Mr. Justice Ashburn in *Dunford* v. *General Water Heater Corp.*, 150 Cal.App.2d 260, 267 [309 P.2d 958].

"The rule that the minds and the deliberations of jurors can occasionally be looked into after rendition of their verdict constitutes a narrow exception to the general recognition of the sanctity of the jury room. It should be carefully limited to cases of wilful concealment upon the juror's *voir dire* examination. Otherwise, ingenious lawyers will be indefatigable in their efforts to examine the jurors after the event and to build constructive misconduct through synthetic concealment,—all based upon matters which were absent from the juror's mind at the time of his examination and not suggested to him by the questions put on *voir dire*. When we reflect upon the fact that judges so often assign faulty reasons for sound rulings and that those reasons are then rejected though the ruling stands, it becomes apparent that the reasoning of jurors should not be the subject of later investigation and that the reasons assigned by one of them in support of the verdict should not open the doors of the jury room. Most people, including judges, harbor numerous latent prejudices which may bear upon the decisions at any time but are not recognized when inquiry is made as to their ability to be impartial in a particular case. All of our opinions are formed in the matrix of our heritage and the background of our experience. If they are to be indiscriminately examined after the event and disqualification imputed retroactively it will be an unfortunate effort to eliminate the human element from the judicial processes. If jurors are to be thus disqualified after the verdict, it will be a sorry day for the integrity of that invaluable aid to administration of real justice."

In the instant case, however, the disqualifying attitude and intentions of the offending juror were present in his mind during his examination as a prospective juror and he was well aware of their existence. They were of such a type

that to countenance them would be to strike down basic concepts of our jury system.

 We now turn to the secondary question whether the misconduct revealed by the affidavits was prejudicial. On this there scarcely can be room for debate. As indicated, although Mr. Fischer, in his later affidavits, states that the original affidavit was prepared before he had been apprised of its language, he does not challenge (except in the one minor detail above noted) the truth of the facts therein set forth. Moreover, the Vehicle Code sections, which he states "controlled" the case, were written thereon in his own hand. These sections provide as follows:

"*Pedestrians.* Pedestrians shall not be permitted upon any vehicular crossing, unless unobstructed sidewalks of more than three feet in width are constructed and maintained and signs indicating that pedestrians are permitted are in place." (Veh. Code, § 23331.)

"*Trespass Prohibited.* It is unlawful for any person to be upon any portion of a vehicular crossing which is not intended for public use without the permission of the Department of Public Works. This section does not apply to a person engaged in the operation, maintenance, or repair of a vehicular crossing or any facility thereon nor to any person attempting to effect a rescue." (Veh. Code, § 23332.)

If any legal mind could fail to appreciate the dangers which would inhere in the practice of allowing jurors to make an independent examination of "law" books during their deliberations, the present example demonstrates them. The cited code sections are found in article 4 of division 11, chapter 13, providing "Special Traffic Regulations" for "Vehicular Crossings." Section 23254 of this chapter defines a "Vehicular Crossing" as ". . . any toll bridge or toll highway crossing and the approaches thereto, constructed or acquired by the Department of Public Works under the provision of the California Toll Bridge Authority Act."

In his affidavit juror Fischer stated: "The verdict rendered on the *Noll* v. *Stoffer* case which involved a pedestrian violating the right of way of a car while picking up objects on a freeway is absolutely correct. The vehicle code is very plain on this point. *I checked the vehicle code on this point and found several provisions which applied to this case. I read these sections to the jury* and most of them agreed with the law I read. There were a few jurors who were sympathetic to the plaintiff because he was injured. These jurors

wanted the Judge to re-read the instructions, but this did not change the opinion of the majority of the jurors. When the judge re-instructed the jury he mentioned *one* of the vehicle code sections I had already read to the jury and which most of the jury agreed with me applied to the case.'' (Italics added.)

The record before us does not disclose that the jury was in fact reinstructed, but it is admitted that at no time were these wholly inapplicable sections, cited by Mr. Fischer as controlling, read to the jury by the trial judge.

Comparison may be made between this situation and the one recently discussed in *People* v. *Hamilton,* 60 Cal.2d 105 [383 P.2d 412, 32 Cal.Rptr. 4], where the court held that it was not misconduct, nor good cause for disqualifying a juror, that the juror had read a copy of the Penal Code while serving on a criminal case. The facts therein are set forth as follows on page 123 : ''. . . during the noon recesses throughout the trial Mrs. McCullough [the offending juror] had extra time on her hands and had utilized the same by browsing in the public library; *that she had no intention of trying to interpret the law, or to learn it as it applied in this case,* but that she became interested in a handbook on law written for laymen, and from that in the Penal Code; that she had read the latter in its entirety; *that she did not pretend to understand the code,* and her *only motive* in reading it was that she felt that a person should be as well informed as possible; *that she was not looking for those parts which applied to the issues discussed in court,* but had read the entire code from beginning to end; *that she had talked to no one else about having read the code or what she found therein;* that this was her *first service as a juror,* and the first time she had ever been in court; that she was still confused, and felt that many of the other jurors were also confused on the subject under discussion on the previous day, *but did not intend to discuss it with anyone.''* (Italics added.)

On this state of facts the court stated (p. 127) : ''It cannot be said that because a juror has read a code, become confused thereby, *requested the court to explain the law to her,* stated that she will accept the explanation as given to her by the court, and *will not communicate what she has read to the other jurors,* she has shown any inability to perform her duty as a juror.'' (Italics added.) Earlier the court had commented as follows (pp. 124 - 125) :

''The showing here is that by reason of reading the Penal

Code (*from innocent motives*) the juror has become confused as to the applicable law, *but has recognized her duty to accept the court's explanation of the law, and has expressed her willingness to be bound thereby.* Such facts, standing alone, do not show an inability to perform her duties as a juror, since the mere reading of the code is not to be equated with a failure to accept the court's instructions as to the law. Nor does mere confusion caused by prior reading of the code indicate that the juror has formulated an opinion *as to what the law is* or should be, *or that she will attempt to urge any such preconceived views upon other members of the panel.*" (Italics added.)

Every potentially harmful attribute of the juror's conduct found *not* to exist in *People* v. *Hamilton, supra,* was dramatically *present* in the instant case. Here Mr. Fischer previously had served on several juries; and, in fact, it was as the result of such previous experience that he reached his decision to search out the law himself. He had read the code with the specific intent to search out sections he deemed applicable to the case being tried, and he did this in order that he might discuss them with the other jurors and thereby correct their "vague[ness] on the law" and their failure to "understand the many instructions read by the Judge."

Here the offending juror read to the other jurors the sections which he considered applicable "and most of them agreed with the law [he] read." He declared that only "a few jurors who were sympathetic to the plaintiff because he was injured" requested that they be reinstructed. The entire tenor of his first affidavit, as well as his admitted conduct during the trial itself and prior thereto, demonstrates that he did not consider himself bound by the court's instructions and, in fact, deliberately violated the very first instruction which declares who shall determine the applicable law.

It has been held that even a communication to the jury by the court itself, if outside the presence of counsel, is an improper irregularity. "Section 614 of the Code of Civil Procedure requires that, if the jury desire further instruction, it shall be conducted into court and the information desired given in the presence of or after notice to counsel. *Any other method of communication is held to go to the substance of the right of trial by jury and because of its nature is deemed to be prejudicial except in very exceptional circumstances.* [Citations.]" (Italics added.) (*Nelson* v. *Southern Pac. Co.,* 8 Cal.2d 648, 655 [67 P.2d 682].)

Finally, it should be noted that Fischer stated as follows in one of his later affidavits: "Although I read one *portion* of the summary of the California Vehicle Code, I can truthfully and honestly state that my verdict and the *verdict of the eight other jurors* would have been the same even if I had been without the summary...." (Italics added.) Obviously, Mr. Fischer could not possibly know what effect his conduct had upon the other jurors. He could not actually state, other than by way of expressing his opinion, what effect his reading of the *"controlling"* section had upon him.

Thus, as noted in *Lombardi* v. *California St. Ry. Co.*, 124 Cal. 311, 317 [57 P. 66], in regard to a similar assertion by an admittedly biased juror: "As to whether the juror was biased in favor of the plaintiff there was not even the shadow of a conflict or contradiction, and the only controversy was as to whether, notwithstanding his bias, he could impartially try the case — *a matter about which the juror could only express an opinion, and which could not be affected by its expression.*" (Italics added.)

The judgment is reversed. The purported appeal from the order denying motion for a new trial and from the order denying motion to reconsider the motion for a new trial, is dismissed.

Fox, P. J., and Ashburn, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 4, 1963.